## CIRCUIT COURT OF BALTIMORE CITY.

Filed December 2, 1913.

ETTA W. GANS
VS.
LOUIS W. GANS.

*Martin Lehmayer, P. August Grill* for plaintiff.

*Wm. Colton* for defendant.

DUFFY, J.—

The parties to this suit were married in Chicago, June 10, 1912, and separated on December 21 of the same year. The relations between them were stormy from the beginning. At the time of the separation the complainant's health was impaired by nervousness. This is clearly proven by the testimony of doctors consulted by her, Doctors Adler and Speer in Baltimore, and Dr. Frankenstein in Chicago. The testimony of the complainant discloses no acts of violence perpetrated upon her by the defendant, the single instance of the bruise upon the wrist being unimportant. But her testimony does disclose a series of instances extending from the beginning to the end of the above mentioned period amounting to a systematic course of treatment which made the separation inevitable, and must have been the direct cause of her ill health. It will serve no good purpose to recount the explosions of temper and the violent insulting and irritating epithets and language used by this husband to his wife. It is sufficient to say that the testimony of the complainant, together with the corroborating testimony and that of the physicians makes out a case of cruelty within the meaning of the statute entitling the complainant to the relief prayed by her in the Bill of Complaint. Harlan Domestic Rel. 34.

In this connection attention is called to the following taken from the wife's narrative of what occurred on the night of Wednesday before the separation:

"So after they left (Mrs. Katz and her son) I went to bed; in fact, I got in bed before Mrs. Katz left and I told her I would try to go to sleep. Mr. Gans pulled his chair up to the bed. He said, 'Now that I have got you alone I can call you anything I please or do anything I want with you; there are no witnesses here. You won't have any witnesses to this. There are not any here now.' With that he started calling me names and cursing, terrible names — I never heard such names in my life.

Q. Was he smoking?

A. Yes; and blowing the smoke in my face, and doing everything in the world to torment me. I stood it as long as I could, and I jumped up and put

on my kimona. I was going out—I didn't know where I was going. He grabbed hold of my wrist and bruised me—he turned my wrist."

The foregoing extract, together with the other testimony tending to prove cruelty, on the part of the husband, makes a case quite similar to that disclosed in Mytton vs. Mytton, 11 Prob. Div. 141.

It it evident that this nervousness and irritability of the defendant was produced by excessive use of liquor. Several witnesses testify to states of inebriety, in which they saw him. Dr. Frankenstein treated him in October in Chicago for the results of alcoholism, and as a part of his treatment ordered the defendant to go to a sanitarium. It is a significant fact that when he returned to Baltimore a few days thereafter and placed himself under the care of Dr. Adler, he took a rest cure at the Hebrew Hospital for three weeks. Both the father and mother of the defendant testified that they had never seen him intoxicated. This is remarkable when we consider the testimony in this case, which tends to prove his inebriety; also when we consider the following language used by his mother to his wife in the letter marked Exhibit 7: "Try and see if you can keep Louis from drinking anything, for that sets him crazy."

Much of the testimony of the defendant and his witnesses was devoted to showing the same intemperance of speech on the part of the wife, as is charged by the wife against the husband. They say she was nagging, stubborn, irritable, profane, neglectful of attention to her husband, that she unreasonably importuned him for money and dress and a fur coat. In this connection it is pertinent to consider these statements made by defendant concerning his wife's people.

Q. That was not the first time you had played cards with them?

A. I played a couple of times; one, two, three or four.

Q. With the same people?

A. Usually the same and always had fights with them. They fought among themselves; cursed each other and called each other names. I never heard anything like that before.

Q. Was that before you were married?

A. Yes.

Q. Then you knew that was a cursing family?

A. I knew I was in a family that was not the class of people I was accustomed to associate with. But I figured I lived 1,000 miles away from them, and they wouldn't come down to be where I was.

Q. That is why you got married, because you knew you were one thousand miles away from them?

A. I figured out getting married like I did business. That is why I didn't take a bigger apartment. I didn't want her people around me. She wanted a housekeeping apartment. She said a housekeeping apartment would be grand for mother's catarrh. She said "won't this be grand when Genevieve grows up, and grows up in society."

Q. Isn't it true you didn't consider her family the social equal of your family?

A. They are not, when father and mother don't live together they never are.

Q. But you knew all that when you married her?

A. No, sir. I didn't know that until in July. They kept that away from me. They brought him out for the wedding and fooled me because if I had known it, I would have married her just the same, because I loved her, but it is right to give a man a good, square deal.

Q. You weren't fooled in any other way, were you?

A. Yes, I was deceived one of the worst in the world.

Q. How?

A. When a wife don't tell her husband that her mother and father don't live together, she is not honest with him. When she does that she is not true and honest with him.

If this is a true statement of facts and of his opinion of his wife's people, he could not have been much deceived in her; if it is the retort of a vindictive witness, it is discreditable.

But taking all of this testimony as to the wife's conduct, and disposition, at its face value, it is not sufficient to account for the intolerable condition that existed at the time of the separation. That the conduct of the complainant was not above reproach must

be admitted. In every case of incompatibility between husband and wife, the primary cause of the infelicity is obscured by accusations and recriminations. It would have been judicious if this wife had sometimes turned away her husband's wrath by a short answer. When instead she gave him a sharp retort; but it is also true that the use of the vile epithets attributed to the defendant called for indignation and resentment on her part.

For instance, the wife testified that on a night in December, in a quarrel that then occurred, he accused her of having had illicit relations with a man in Chicago before her marriage. The defendant denies this, but it must be true, for it was heard by Mrs. Katz and her son, two disinterested witnesses. In his testimony, the defendant admitted that his wife is a virtuous woman. It is small wonder that she resented this insult, and threw a magazine at him.

The Court concludes from a consideration of the whole testimony that the misconduct of the husband was the cause of the unfortunate termination of the marital relations, and that this misconduct was sufficiently cruel and vicious to justify the wife in leaving him on December 21, 1912.

A decree will be filed for a divorce a mensa and awarding to the complainant a moderate alimony, and counsel fee.